# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-4966
_____

JAMES JUSTIN CHANNELL,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Escambia County.
J. Scott Duncan, Judge.

November 30, 2018

LEWIS, J.

Appellant, James Justin Channel, appeals his final judgment of conviction and sentence, challenging the denial of his amended motion to suppress seized evidence. For the reasons that follow, we affirm.

## BACKGROUND

Appellant was charged with possession of firearm by a convicted felon (Count 1), possession of methamphetamine (Count 2), resisting officer without violence (Count 3), possession of less than twenty grams of cannabis (Count 4), and possession of drug paraphernalia (Count 5). He filed an amended motion to suppress, seeking in part the suppression of items seized.

During the suppression hearing, Sergeant Jason Von Ansbach-Young and Investigator Cory Caves testified that on February 23, 2017, around 10:30 a.m., they went to the Super 6 Inn on Plantation Road upon receiving information from an ATF investigator that room 137 was being used by a group of people—including a white male with an outstanding warrant—who had large quantities of narcotics and firearms in the room and that another hotel room and a white Kia were also involved. The Super 6 Inn is in a high crime area where law enforcement frequently responds to complaints of narcotics, weapons offenses, and prostitution. The officers rode in an unmarked vehicle and wore blue jeans and a black shirt that said "Sheriff's Office" on the front and back and had a star insignia on the side. Within ten minutes of setting up surveillance, the officers saw a white male exit room 137 with a duffel bag and walk in an unusual manner, changing directions several times and glancing at the undercover vehicle. Both initially and ultimately, the man was walking toward the back of the hotel, where the Kia was located. The officers did not know who the man was, but decided to make contact with him.

Von Ansbach-Young has been with the sheriff's office for about ten years and worked in narcotics for five years. Within moments of Von Ansbach-Young exiting his vehicle and making eye contact with the man, the man started running. Von Ansbach-Young believes he asked the man if he would mind talking to him for a minute, but does not think he got a full sentence out before the man began to run toward room 137; in the process, the man dropped his bag. Caves testified that upon exiting the vehicle, he asked the man if he could talk to him, and the man said, "yes, officer, just one second," but then dropped the bag and ran. Von Ansbach-Young was identifying himself and giving the man commands to stop while chasing him. As Von Ansbach-Young was closing the distance between them, he could see the man "messing with an object" in his waistband and saw that it was a firearm. Von Ansbach-Young then made contact with the man.

Once Caves was able to place the man in handcuffs, he searched him and found a gun tucked into his shorts where he had been reaching. Von Ansbach-Young immediately proceeded toward room 137 because he saw that the door was open and there was a person standing near it. The person near the hotel room ran

2

off, but Von Ansbach-Young realized it was a member of the hotel cleaning staff who went to notify other staff of law enforcement's presence. Given that the door was open, and based on the information received about a large quantity of narcotics and firearms being inside the room, Von Ansbach-Young "stepped into the room and cleared it to make sure that there was no people in there that could gain access to the firearms or destroy evidence." No one was inside the room and Von Ansbach-Young did not conduct a search or collect evidence; however, he observed on the bedside table a small plastic baggie containing what he believed to be methamphetamine. After searching the man, Caves walked him into the hotel room to seat him. Caves identified that man in court as Appellant. Once in the room, Appellant made spontaneous statements that he only smokes a little marijuana and only sells a little methamphetamine. The duffel bag, firearm, and baggie of methamphetamine were collected.[1]

Appellant testified that while outside of Super 6 Inn, two men walked up to him with their guns holstered. Appellant did not know who the men were and did not say anything to them; instead, he ran as the men were about fifteen to twenty yards from him. Appellant tripped while running and "wound up with people on [his] back, and then they turned out to be police officers." Appellant was handcuffed and led back into room 137. Room 137 was in someone else's name, but Appellant was staying there, and he did not give the officers permission to enter. When the officers seated Appellant in the hotel room, they offered him medical assistance for a head injury. The officers did not search the room while Appellant was there.

The trial court denied the motion to suppress with regard to the evidence seized and made the following findings and conclusions: The officers' initial contact with Appellant was a consensual encounter because they did not give him any commands and merely began to ask him a question. Once Appellant ran, the officers had reasonable suspicion to chase and

---

[1] Count 1 was based on the firearm, Count 2 was based on the methamphetamine found in the room, and Counts 4 and 5 were based on the contents of the duffle bag.

3

seize him given that Plantation Road is a high crime area and his immediate flight upon seeing the police was unprovoked. Even if Appellant's flight in a high crime area alone did not give rise to reasonable suspicion, many additional facts in combination therewith gave the officers reasonable suspicion. Moreover, during the chase, the officers' reasonable suspicion turned into probable cause because of their observation that Appellant was carrying a concealed weapon, as well as because of his obstruction and resistance of the officers. Appellant cannot claim a Fourth Amendment violation as to the duffel bag because he abandoned it when he dropped it in a public parking area. Lastly, Sergeant Von Ansbach-Young was justified in executing a protective sweep of Appellant's hotel room under the facts of the case and the seizure of the baggie of methamphetamine was proper under the plain view doctrine.

Thereafter, Appellant entered a plea of no contest to the charges, while expressly reserving his right to appeal the denial of the dispositive motion to suppress. The trial court entered a Judgment and Sentence, whereby it adjudicated Appellant guilty and sentenced him on Count 1 as a habitual felony offender to nine years of imprisonment, with a three-year mandatory minimum for the firearm, on Count 2 to a concurrent term of 63.075 months in prison, and on Counts 3 through 5 to time served. This appeal followed.

## ANALYSIS

A trial court's ruling on a motion to suppress is presumed correct, and we must interpret the evidence and reasonable inferences derived therefrom in a manner most favorable to sustaining the trial court's ruling. *State v. Dickey*, 203 So. 3d 958, 961 (Fla. 1st DCA 2016). It is for the trial court to make credibility determinations and to weigh the evidence. *Id.* We defer to the trial court's findings of fact if supported by competent, substantial evidence, but review de novo the application of the law to those facts. *Id.*

There are three levels of police-citizen encounters. *Id.* The first one is a consensual encounter during which a citizen may voluntarily comply with the officer's request or ignore him or her. *Id.* Whether an encounter was consensual depends on whether the

4

officer's words and actions would have led a reasonable, innocent person to believe that he was not free to leave. *Caldwell v. State*, 41 So. 3d 188, 197 (Fla. 2010).

The second level of encounter is an investigatory stop during which an officer may temporarily detain a citizen upon a reasonable suspicion that the person has committed, is committing, or is about to commit a crime. *Dickey*, 203 So. 3d at 961; *see also Tobin v. State*, 146 So. 3d 159, 161 (Fla. 1st DCA 2014) (explaining that for an investigatory stop to be permissible, the officer must have a well-founded, articulable suspicion; mere suspicion is not enough). In deciding whether an officer had a well-founded suspicion of criminal activity, the trial court must consider the totality of the circumstances. *Partlow v. State*, 134 So. 3d 1027, 1030 (Fla. 1st DCA 2013). Factors that may be considered in making that determination include the time of day, the suspect's appearance and behavior, anything unusual in the situation as interpreted in light of the officer's knowledge, the officer's experience, the reputation of the location, and the suspect's flight from an officer. *Huffman v. State*, 937 So. 2d 202, 206 (Fla. 1st DCA 2006).

Although flight is insufficient by itself to justify an investigatory stop, it can give rise to a reasonable suspicion of criminal activity when combined with some additional factor(s), such as presence in a high crime area. *Parker v. State*, 18 So. 3d 555, 558 (Fla. 1st DCA 2008) (citing in part *Illinois v. Wardlow*, 528 U.S. 119 (2000), where the Court held that unprovoked flight in a high crime area is a ground for reasonable suspicion that criminal activity is afoot, upheld the reasonableness of an investigatory stop where the defendant "'fled upon seeing police officers patrolling an area known for heavy narcotics trafficking,'" and reasoned that "'[u]nprovoked flight is not a mere refusal to cooperate. Flight, by its very nature, is not going about one's business; in fact it is just the opposite'"). In *Parker*, we held that the officer had reasonable suspicion to conduct an investigatory stop once the appellant began to run because he knew that a domestic battery had recently been committed by a black male a block away and the suspect was at large, it was approximately 3:00 a.m., there were two black males on the otherwise empty street,

and they both ran when he shined a spotlight in their direction. *Id.* at 559.

The third level of encounter is an arrest, which must be supported by probable cause. *Dickey*, 203 So. 3d at 961. "To establish probable cause, the State must demonstrate that an officer had reasonable grounds to believe that the arrestee committed a crime." *Hughes v. State*, 132 So. 3d 933, 935 (Fla. 1st DCA 2014).

Moreover, law enforcement has no right to enter one's private property without a warrant or an exception to the warrant requirement. *Daniels v. State*, 208 So. 3d 1223, 1226 (Fla. 2d DCA 2017). One such exception is a protective sweep, which is defined as "'a quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or others.'" *Id.* (citation omitted). A protective sweep may be conducted regardless of whether the arrest occurred inside or outside the premises, but "may only be performed when officers 'have a reasonable, articulable suspicion that the protective sweep is necessary due to a safety threat or the destruction of evidence.'" *Id.* (citation omitted); *see also Kentucky v. King*, 563 U.S. 452, 455 (2011) ("It is well established that 'exigent circumstances,' including the need to prevent the destruction of evidence, permit police officers to conduct an otherwise permissible search without first obtaining a warrant."); *State v. McRae*, 194 So. 3d 524, 529 (Fla. 1st DCA 2016) ("The exigent circumstances exception to the warrant requirement requires that the warrantless entry by police on to private property be reasonable given the totality of the circumstances. . . . A set of facts must exist that precludes taking the time to secure a warrant. . . . Officer safety has long been recognized as an exigent circumstance justifying warrantless entry of a residence.").

Turning to this case, Appellant challenges three of the trial court's legal conclusions, but does not contest its detailed findings of fact. Appellant first challenges the trial court's conclusion that the officers' initial encounter with him was consensual. However, Appellant waived this argument by contending below that the initial contact was a consensual encounter. *See Terry v. State*, 668 So. 2d 954, 961 (Fla. 1996) (concluding that the appellant had

waived his argument on appeal because it was different from his argument at trial). Regardless, the argument is without merit because the undisputed evidence was that the officers did not give Appellant any commands or draw their weapons and merely asked him if they could talk to him. Under those circumstances, a reasonable person would have felt free to leave, rendering it a consensual encounter. Appellant's only argument is that the trial court's finding is erroneous because he was not free to terminate the encounter given that when he tried to, he was chased. However, Appellant did not simply choose to ignore the officers' questions or decline to answer them; instead, he ran. Additionally, Appellant's argument looks to the next stage of the encounter, whereby the officers' actions transformed what began as a consensual encounter into an investigatory stop.

Appellant next argues that the trial court erred in concluding that the officers had reasonable suspicion to detain him. However, this Court has held that flight can justify an investigatory stop if coupled with some additional factor, and that additional factor may be presence in a high crime area. *Parker*, 18 So. 3d at 558. Because the officers chased Appellant only after he engaged in unprovoked flight in a high crime area, they possessed the requisite reasonable suspicion. Besides, as the trial court found, additional facts supported a reasonable suspicion: The officers had been informed by an ATF investigator that a white male with an outstanding warrant and some others were using room 137 and another room for illegal activities, they had large amounts of drugs and firearms in the rooms, and a Kia was involved. The officers saw Appellant, a white male, exit room 137 with a duffel bag; observed him walking in a peculiar manner, changing directions several times; and saw that he was walking toward the Kia parked behind the hotel. Appellant then engaged in unprovoked flight in a high crime area.

Lastly, Appellant maintains that the trial court erroneously concluded that the warrantless search of room 137 was justified as a protective sweep.[2] He argues that there was no reason to believe

---

[2] Notably, Appellant does not contest the trial court's conclusions that he abandoned the duffle bag and that the officers'

that other persons were in the room or that they knew that he was arrested such that they may pose a threat to the officers or destroy evidence. In doing so, Appellant ignores the undisputed facts: The officers received information from an investigator that there was a group of people, including a white male, in the room and that they had large quantities of drugs and firearms in the room; they subsequently seized Appellant, a white male who had exited that room and carried a concealed firearm; and the room's door was open, allowing any occupants who could gain access to the firearms or destroy evidence to witness Appellant's arrest. Based on the totality of the circumstances, the officers had reasonable suspicion that a protective sweep was necessary due to a safety threat and/or the destruction of evidence.

Accordingly, we hold that the trial court's ruling on the amended motion to suppress was correct and affirm Appellant's judgment and sentence.

AFFIRMED.

WOLF, J., concurs; ROWE, J., concurs in result.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Andy Thomas, Public Defender, and Laurel Cornell Niles, Assistant Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, Tabitha Herrera and Kaitlin Weiss, Assistant Attorneys General, Tallahassee, for Appellee.

reasonable suspicion transformed into probable cause during the chase.

8